OPINION
{¶ 1} Defendant-appellant, Jerry L. Cox, was indicted on 12 counts, including rape, a violation of R.C. 2907.02 and sexual battery, a violation of R.C. 2907.03. The trial court dismissed five counts. After a jury trial, appellant was found guilty of the remaining counts, two counts of rape and five counts of sexual battery. The trial court sentenced appellant to five years of imprisonment on each count, to run concurrently. Appellant filed a notice of appeal, and raised the following assignment of error: *Page 2 
 Appellant's convictions are against the manifest weight of the evidence.
 {¶ 2} By the assignment of error, appellant contends that his convictions were against the manifest weight of the evidence. The test for whether a judgment is against the manifest weight of the evidence involves a limited weighing of the evidence by the court to determine whether there is sufficient, competent, credible evidence which could convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. In State v. Thompkins (1997), 78 Ohio St.3d 380, 387, the Supreme Court of Ohio described the standard of review, as follows:
 * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on the weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." (Emphasis added.) Black's [Law Dictionary (6 Ed. 1990)], at 1594.
 {¶ 3} The state presented only one witness, A.K., appellant's stepdaughter. A.K., currently 21 years old, testified that her parents divorced when she was five years old. Her mother, S.C., was depressed after the divorce. (Tr. 54.) Her father joined the Navy and she saw him infrequently until her high school graduation. Her mother met appellant and married him when A.K. was eight years old. A.K. did not like appellant at first because she thought he was replacing her father and she hoped her parents would reconcile. After the marriage, however, the relationship improved because she realized how happy appellant made her mother. (Tr. 55.) A.K. testified that she would sit on *Page 3 
appellant's lap and then he began to touch her leg. The touching escalated. When she was 11 years old, on December 7, 1996, they had their first sexual intercourse. She remembers that day because it was her father's birthday and Pearl Harbor Day and her father was in the Navy. (Tr. 59.) Appellant told her not to tell her mother because her mother would be devastated. The next time they had sexual intercourse, was when the family was moving to a new house in June/July 1997. Appellant took her into an empty bedroom for sex. She was almost always cooperative except one Christmas when she was ill, she refused. He kept asking and he forced himself on her. (Tr. 68.) One time she performed fellatio on appellant but she did not like it so they did not do it again. (Tr. 69-70.) Once they moved to the new house, they averaged sexual intercourse once per week until she was 18 years old, which was over 300 times in six years. (Tr. 70; 157.) Typically, they would have sex in the basement, on a white couch.
 {¶ 4} A.K. testified that she viewed the relationship as normal. She looked to appellant to tell her whether the situation was right or wrong. Appellant told her that even if society did not approve, that did not make the relationship wrong. (Tr. 68.) He also used the Bible to convince her that a man could have more than one wife. (Tr. 71-72.) When she was 13, she told a friend about her physical relationship with her stepfather. The friend told a school counselor. Appellant told her to tell the counselor that the friend was lying. So, when confronted, A.K. told the counselor that the friend had lied. (Tr. 79-81.)
 {¶ 5} At first, appellant wore condoms but A.K. found them uncomfortable, so appellant would pull out before ejaculation. (Tr. 76.) When A.K. was 16 years old, appellant wanted her to go to the gynecologist to get birth control pills but she refused *Page 4 
because she knew that the doctor would be able to discern that she was sexually active and she did not want to have to explain the sexual activity. (Tr. 77.)
 {¶ 6} When A.K. was 18 and graduated from high school, she started working at AMC Theaters. She started dating and stopped the sexual relationship with appellant. Appellant told her that she was his wife and she could not leave him for someone else. (Tr. 82.) She began dating Kevin, and her mother and appellant disliked him. In 2005, she moved out of the house and told her grandmother about the sexual abuse. Her grandmother encouraged her to tell her mother and she did a few days later.
 {¶ 7} S.C., appellant's wife and A.K.'s mother, testified for the defense. She stated that she and A.K. had a very close relationship until A.K. started dating Kevin and her personality changed. (Tr. 209.) S.C. is a light sleeper and wakes up if one of her children or the dog gets up at night. (Tr. 201.) She testified that at first, A.K. was reserved around appellant. But, between 1993-1996, they became very close and A.K. called appellant "Dad." (Tr. 221.) A.K. even wanted appellant to adopt her.
 {¶ 8} S.C. testified that at age 16, A.K. refused to go to the gynecologist. (Tr. 227.) Appellant urged S.C. to take A.K. to a gynecologist, beginning at age 13, because of her severe menstrual cramps. (Tr. 228.)
 {¶ 9} S.C. testified that appellant was gone from the house on December 7, 1996, from 7:00 in the morning until 2:00 or 3:00 a.m. on December 8, because he was at a Capcon gaming convention. When the family was moving in 1997, A.K. was staying with her grandparents. (Tr. 241.)
 {¶ 10} A.K. told S.C. about the allegations on April 15, 2005. After that, there was a flood in the basement of the family home and appellant put the white couch in the trash. *Page 5 
(Tr. 248.) S.C. testified that appellant had punched a hole in a closet door once and spanked the children, sometimes with a belt. (Tr. 253-254.) She also testified that when A.K. first told her about the allegations, she said it started when she was 11 and ended when she was 16 but when A.K. told the police, she said it started at age 11 but ended at age 17. (Tr. 230-231.)
 {¶ 11} Christine Ellis, S.C.'s friend of 34 years also testified. She stated that A.K. and S.C. were very close. A.K. and appellant had a good relationship, that A.K. loved him as a father figure and called him "Dad." (Tr. 275-276.) Ms. Ellis was present when A.K. first told her mother about the allegations and she testified that A.K. told her that she had been having dreams since she was 11 years old, would wake during the night with cold sweats, and did not remember the dreams until a couple weeks before she revealed the allegations. When she remembered the dreams, they were about the allegations and they were not dreams but actually happening. (Tr. 281.) Ms. Ellis stated that A.K. called her a couple weeks after revealing the allegations and when Ms. Ellis questioned her about the dreams, A.K. told her she had misunderstood. (Tr. 282.)
 {¶ 12} M.G., S.C.'s mother and A.K.'s grandmother, testified. She stated that she was very close to A.K. until A.K. began working at the movie theater and began resenting her curfew. (Tr. 293-296.) A.K. had lived with her several times, such as after her parents were divorced and while the family was moving in 1997. S.C. was in complete shock when A.K. told her about the allegations. (Tr. 299.) M.G. also stated that one time A.K. said the abuse started when she was 11 years old and another time said it started when she was 13 years old. (Tr. 302-303.) *Page 6 
 {¶ 13} Finally, appellant testified. He stated that initially A.K. did not speak to him and she was disgruntled when he married her mother. (Tr. 313.) However, after he took her to visit her father, their relationship "flourished." Id. He denied ever acting as a husband towards her. (Tr. 316.) The two watched television and movies together and he helped her with her math homework and music lessons. (Tr. 315.) A.K. confided in him and told him things she did not even tell her mother. A.K. told him she was contemplating having sex with a boy at school and he advised against it but bought her a box of condoms. (Tr. 317-318.) Appellant became more involved with A.K.'s younger brothers and A.K. complained that they never spent time together. (Tr. 319.)
 {¶ 14} Appellant testified he did not like A.K.'s boyfriend, Kevin, because of the way they acted together and the way Kevin treated the family dog. (Tr. 322.) Between October 2004 and April 2005 the basement flooded six times and in April, he put the white couch in the trash because it had mold damage. (Tr. 330.) Appellant denied all the allegations and stated that on December 7, 1996, he was out of the house all day at a Capcon convention. (Tr. 330.) The kids were at their grandparents' house during the move in 1997. He believed A.K. made the allegations because appellant does not like her boyfriend, Kevin. (Tr. 338.)
 {¶ 15} Appellant contends that his convictions are against the manifest weight of the evidence. All of the counts alleged a time span within a range of December 7, 1996 to March 14, 2003. R.C. 2907.02
provides, in pertinent part, as follows:
 (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when any of the following applies:
 * * * *Page 7 
 (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
 * * *
 (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
 R.C. 2907.03 provides in pertinent part, as follows:
 (A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
 * * *
 (5) The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person.
 {¶ 16} A.K. testified that she was born on March 14, 1985. Beginning when she was 11, she described the sexual incidents involving her and appellant, who was her stepfather. She testified that appellant put his penis into her vagina more than 300 times, she performed fellatio once and that he performed oral sex upon her.
 {¶ 17} She explained that appellant convinced her that the relationship was normal and acceptable and he told her to lie and that her mother would be devastated if she knew of the relationship. A.K. explained that she did not want her mother to be devastated and she feared appellant's anger and what he would do to her younger brother.
 {¶ 18} Appellant denied engaging in sexual conduct with A.K. but also testified that the specific dates she recalled were impossible for him to have committed the acts *Page 8 
because of a lack of opportunity. S.C. also testified that those dates were impossible for him to have committed the acts. However, the jury was not required to believe appellant's testimony. A conviction is not against the manifest weight of the evidence solely because the jury heard inconsistent testimony. State v. Kendall (June 29, 2001), Franklin App. No. 00AP-1098. Such determinations of credibility and the weight to be given to the evidence are for the trier of fact. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. A.K.'s testimony constitutes sufficient, credible evidence to convince a reasonable trier of fact of appellant's guilt beyond a reasonable doubt. Appellant's convictions are not against the manifest weight of the evidence and his assignment of error is not well-taken.
 {¶ 19} For the foregoing reasons, appellant's assignment of error is overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
 PETREE and KLATT, JJ., concur.
WHITESIDE, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution. *Page 1